IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
APR 30 2009
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Case No. 1:09-MJ- 310 |
| ) | |
| IBN MUQUADDIN SHAFI, ) | |
| ) | |
| Defendant ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Heather Melendez, being duly sworn, do hereby state:

### I. INTRODUCTION

1. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since December 9, 2007. I am currently assigned to a white collar squad at the Washington Field Office, Northern Virginia Resident Agency, in Manassas, Virginia. In that capacity, I am familiar with investigations involving various types of financial crimes, including bank fraud, securities fraud, mortgage fraud, mail fraud, and fraud by wire.

2. By virtue of my experience and training as a Special Agent, I am familiar with investigations involving individuals who have devised or intended to devise schemes and/or artifices to defraud, or obtain money or property by means of false or fraudulent pretenses, representations, or promises.

3. This affidavit is submitted in support of an application for a criminal complaint and arrest warrant charging IBN MUQUADDIN SHAFI (hereinafter referred to as SHAFI), doing business as YASIK GROUP, LLC, with the crime of wire fraud in violation of Title 18, United States Code, Section 1343.

4. As a result of my personal participation in the investigation referred to in this affidavit, including interviews of victims, witnesses and bank personnel, extensive reviews of bank account records, and numerous database checks, I am familiar with the facts and

circumstances of this investigation. I have not set forth every detail known to me or the government about this investigation, but rather, only those facts I believe are necessary to support probable cause. On the basis of my familiarity with this investigation, I have determined the following:

## II. SUMMARY OF CASE

5. Based on interviews of numerous victim/witnesses, as well as an analysis of SHAFI's finances for a two and a half year period, it appears that SHAFI is conducting an orchestrated scheme to defraud wherein he holds himself as a real estate developer as part of a scheme to obtain funds from investors. SHAFI uses his purported real estate experience, and provides false tax returns and financial statements to entice individuals to invest in his various projects. In furtherance of his scheme, he then fails to use the investor and/or lender proceeds for their intended purpose.

## III. OVERVIEW OF CASE ESTABLISHING PROBABLE CAUSE

6. In or about November 2004, SHAFI convinced investors known as W-1, W-2, and W-3 to invest $300,000 in a land development project called the BELLES AT MALTA, near Saratoga Springs in Malta, New York. SHAFI told W-1 that the money would be used for clearing the land, permits, zoning, travel expenses, engineering drafts and other expenses necessary to prepare the land for further development for a nano technology company. SHAFI assured both W-1 and W-2 that the $300,000 would be used directly for the project.

7. On or about March 7, 2005, W-1, W-2, and W-3 signed a joint venture agreement with SHAFI. W-1, W-2, and W-3 agreed to invest $300,000, in, according to the agreement, "a development in Saratoga County, New York" and were promised a return of $1 million for their investment. Initially, the $300,000 was supposed to be paid in $50,000 monthly increments over six months. However, due to SHAFI continuously pressing for the payments, the entire $300,000 was paid to SHAFI within three months.

8. According to W-1, once the $300,000 was funded, SHAFI became difficult to reach and would not take or answer his calls with regularity anymore. In early 2006, W-1

learned that SHAFI had not been paying GEORGE ROSE, the BELLES AT MALTA financial officer. W-1 also learned that ROSE had been using ROSE'S own money for project related travel. At this time, W-1 began requesting copies of receipts from SHAFI to determine what he had spent the $300,000 on. Despite promises to provide them, SHAFI has never done so.

9. On February 26, 2008, Special Agents JOHN C. COTTER and MICHAEL P. KELLY interviewed SHAFI, at which time he provided a signed statement admitting that he misled W-1, W-2, and W-3 in order to induce them into giving him the $300,000. SHAFI claimed to have a lot of overdue personal business and business bills that needed to be paid as soon as he received any of the $300,000.

10. Contrary to SHAFI's assertion that he spent $200,000 of the $300,000 directly on the project, the investigation has revealed that only approximately $23,733 went towards the project. The remaining funds were spent on a variety of non-MALTA related uses, including BMW payments, a BMW for a girlfriend, rugs, artwork, spa treatments, and personal utilities. Other non-MALTA related expenditures included payments of personal loans, numerous payments to other investors, a $65,000 settlement payment in an unrelated civil case, dining, clothing, accessories, and many other self evident personal expenses.

11. From all appearances, SHAFI used the bulk of the $300,000 investment to fund his own personal lifestyle. He spent the entire $300,000 within approximately five months, using only approximately $23,733 for its intended purpose. During this period of time, the W-1, W-2, W-3 investment was the only source of outside income derived by SHAFI.

12. SHAFI hired ROSE as a consultant to assist with the BELLES AT MALTA project in March 2005. Their agreement called for SHAFI to make $6,500 monthly payments to ROSE plus expenses to be invoiced each month. Despite their agreement, SHAFI failed to reimburse ROSE for his expenses and pay the $6,500 monthly invoices for ROSE'S work on the BELLES AT MALTA project until 2006. According to ROSE, SHAFI also neglected to pay other vendors who provided services to the project. Because

services were not being paid, no engineering work was being done on the MALTA project during this time. Beginning around July 2005, ROSE received an increasing number of complaints from vendors about unpaid bills.

13. It was not until 2006, after ROSE had spent a good deal of time on the MALTA project, that he learned that W-1 and two others had invested $300,000. ROSE advised that he should have known about this investment and that it should have been segregated into a separate account with the other project expenditures.

14. In an effort to compile accurate models, ROSE constantly reminded SHAFI that he needed all receipts and cancelled checks documenting project expenditures. In spite of ROSE'S efforts, SHAFI rarely provided him with documentation relating to expenses.

## IV. ANALYSIS OF THE SCHEME

15. SHAFI received a total of ten checks from W-1 and W-2. SHAFI deposited the proceeds into his YASIK GROUP, LLC accounts at Provident Bank, BB&T and M&T Bank.

### Payment #1 - March 5, 2005

16. SHAFI received the first payment, in the amount of $30,000, on March 5, 2005. According to SHAFI, instead of depositing this check directly into his account, he went to the payor bank, M&T BANK, to purchase a cashier's check in order to have access to the funds right away. SHAFI then went to Provident Bank's Dulles Branch, located at 2545 Centreville Road, Herndon, Virginia 20171, and deposited the cashier's check into his account number -7368, held in the name YASIK GROUP, LLC on March 7, 2005.

17. Prior to receiving $30,000 on March 5, 2005 from W-1, SHAFI had a balance of $1,540.19 in his YASIK GROUP, LLC, PROVIDENT BANK account number -7368. During this time, SHAFI was behind on rent payments to WATCH HOLDINGS, LLC for his office space.

18. On March 3, 2005, two days prior to signing the BELLES AT MALTA contract, SHAFI wrote check #4220 from PROVIDENT BANK account number -7368, in the amount of $10,774.12, payable to WATCH HOLDINGS, LLC with a note in the memo

field stating "January & February Rent plus CAMS" and check #4221 in the amount of $5,387.06, payable to WATCH HOLDINGS, LLC with a note in the memo field stating "March Rent and CAMS."

19. On March 7, 2005, after receiving the $30,000 W-1/W-2/W-3 payment dated March 4, 2005, SHAFI wrote check #4227 from PROVIDENT BANK account number -7368, in the amount of $3,500, payable to WHM INVESTMENTS with a note in the memo field stating "Interest Payments (2)." BILL MILLER of WHM INVESTMENTS is a SHAFI investor and Orange, Virginia realtor who apparently borrowed $4 million to $5 million on SHAFI'S behalf for an Orange, Virginia project called KNOB HILL.

20. On March 8, 2005, after receiving the $30,000 W-1/W-2 payment on March 5, 2005, SHAFI wrote check #4225 from PROVIDENT BANK account number -7368, in the amount of $2,700, payable to SERGE SEFECME with a note in the memo field stating "...Investment repay."

**Payment #2 - March 9, 2005**

21. On March 9, 2005, SHAFI deposited a second check in the amount of $160,000 into his PROVIDENT BANK account number -7368, held in the name YASIK GROUP LLC. Again, SHAFI purchased a cashier's check in order to gain access to the money right away.

22. On March 9, 2005, after the W-2 deposit above, SHAFI wrote check #4228 from PROVIDENT BANK account number -7368, in the amount of $1,650, payable to SECURITY FINANCIAL with a note in the memo field stating "loan repayment plus interest."

**Payment #3 - March 10, 2005**

23. On March 10, 2005, SHAFI deposited a third check in the amount of $10,000 into his PROVIDENT BANK account number -7368, held in the name YASIK GROUP LLC. This check reflected a medallion guarantee, again providing SHAFI with access to the money right away.

24. On March 11, 2005, after the W-1/W-2 deposit above, SHAFI wrote check #4231 from PROVIDENT BANK account number -7368, in the amount of $5,000, payable to SHARON JOHNSON with a note in the memo field stating "Loan Repay." SHARON JOHNSON is the name of SHAFI'S mother. According to an interview with ANITA KAYSER, SHAFI's ex-girlfriend, it is also the name of a woman who was constantly calling SHAFI to get him to repay money he owed her.

25. On March 12, 2005, after the deposit above, SHAFI wrote check #4235 from PROVIDENT BANK account number -7368, in the amount of $5,000, payable to SHELLY L. GARRET. During an interview, GARRET could not recall the purpose of the above check. She stated that while she and SHAFI were dating, he would occasionally loan her money.

26. On March 14, 2005, after the deposit above, SHAFI wrote check #4236 from PROVIDENT BANK account number -7368, in the amount of $1,860.42, payable to DOROTHEA C. LASSITER with a note in the memo field stating "Severance/Separation Payment." DOROTHY LASSITER is the name of a woman who briefly worked for SHAFI.

27. On March 21, 2005, after the deposit above, SHAFI wrote check #4244 from Provident Bank account number -7368, in the amount of $65,000, payable to Provident Bank, on a settlement on a civil suit, with a note in the memo field stating "settlement/purchase."

**Payment #4 - May 4, 2005**

28. On May 4, 2005, SHAFI deposited a fourth check in the amount of $10,000 into his PROVIDENT BANK account number -7368, held in the name YASIK GROUP, LLC. This check reflected a medallion guarantee, again providing SHAFI with access to the money right away. Prior to depositing this check into his account SHAFI had a negative balance of ($7,677.06).

29. On May 10, 2005, after the deposit above, SHAFI wrote check #4271 from PROVIDENT BANK account number -7368, in the amount of $7,509.73, payable to WATCH HOLDINGS, LLC with a note in the memo field stating "April/May Rent."

**Payment #5 - May 13, 2005**

30. On May 16, 2005, SHAFI deposited a fifth check in the amount of $15,000 into his BB&T BANK account number -3677.

**Payment #6 - May 16, 2005**

31. On May 16, 2005, SHAFI deposited a sixth check in the amount of $5,000 into his PROVIDENT BANK account number -7368, held in the name YASIK GROUP, LLC. Prior to depositing this check into his account SHAFI had a negative balance of ($1,039.66).

32. On May 19, 2005, after the deposit above, SHAFI wrote check #4272 from PROVIDENT BANK account number -7368, in the amount of $10,000, payable to RUG HOME, INC. Shortly thereafter, this check was returned due to insufficient funds in SHAFI'S account.

**Payment #7 - May 20, 2005**

33. On May 20, 2005, SHAFI deposited a seventh check in the amount of $10,000 into his PROVIDENT BANK account number -7368, held in the name YASIK GROUP, LLC. This check reflected a medallion guarantee, again providing SHAFI with access to the money right away. Prior to depositing this check into his account SHAFI had a balance of $960.34 in his account.

34. On May 27, 2005, after the deposit above, SHAFI wrote check #4278 from PROVIDENT BANK account number -7368, in the amount of $5,000, payable to BMW OF STERLING.

**Payment #8 - May 27, 2005**

35. On May 27, 2005, SHAFI deposited an eighth check in the amount of $10,000 into his BB&T BANK account number -3677.

**Payment #9 - June 1, 2005**

36. On June 1, 2005, SHAFI deposited a ninth check in the amount of $15,000 into his M&T BANK account number -8462, and then received $5,000 cash back. Prior to depositing this check into his account SHAFI had a balance of $50.00 in his account.

**Payment #10 - June 7, 2005**

37. On June 7, 2005, SHAFI deposited a tenth and final W-1/W-2 check in the amount of $35,000 into his M&T BANK account number -8462. By September, 7, 2005, SHAFI had a negative balance of ($75.05) in his account.

V.   **WIRE FRAUD**

38. According to ROBERT MICHAEL NEWMAN at PROVIDENT BANK'S OPERATION CENTER in Baltimore, Maryland, all checks originating from an M&T BANK, that are deposited into a PROVIDENT BANK account in Virginia, are taken to a proxy called FIDELITY NATIONAL INFORMATION SERVICES ("FNIS") in Sterling, Virginia. For each check received, FNIS sends an electronic posting file containing pertinent information on the check to a core processor called METAVANTE CORPORATION, located in Milwaukee, Wisconsin. All W-1/W-2 checks originated from an M&T BANK. A total of six out of the ten checks were deposited into SHAFI's PROVIDENT BANK account number -7368 located in Virginia.

VI.   **CONCLUSION**

39. Based upon the above information, I believe that on or about March 9, 2005, IBN MUQUADDIN SHAFI committed wire fraud within the Eastern District of Virginia in violation of Title 18, U.S.C. § 1343.

40. Therefore, I respectfully request that a criminal complaint charging IBN MUQUADDIN SHAFI with the crime of wire fraud be authorized and that an arrest warrant be issued to any duly authorized Officer of the United States to arrest IBN MUQUADDIN SHAFI.

41. Further your affiant saith not.

_____
Heather Melendez
Special Agent
Federal Bureau of Investigation
Manassas, Virginia

SUBCRIBED AND SWORN BEFORE ME THIS 30th DAY OF APRIL, 2009 AT ALEXANDRIA, VIRGINIA.

/s/Thomas Rawles Jones, Jr.
_____
THE HONORABLE THOMAS RAWLES JONES, JR.
UNITED STATES MAGISTRATE JUDGE

9